UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| NEAL D'ALESSIO, KIMBERLY STEVENS, and MARK BECK, individually and on behalf of all others similarly situated, | Civil Action No.: _____ |
| Plaintiff(s), | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| MATCH GROUP, LLC. | |
| Defendant. | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs NEAL D'ALESSIO, KIMBERLY STEVENS, and MARK BECK, ("Plaintiffs"), individually and on behalf of all others similarly situated, through their undersigned counsel, alleges for their Class Action Complaint against Defendant, Match Group, LLC, ("Defendant") based upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including the investigation conducted by their counsel as follows:

## NATURE OF ACTION

1.      This action stems from Defendant's practice of using a variety of deceptive and unfair means to trick consumers into purchasing subscriptions to use Defendant's online dating service, even where Defendant knows that these consumers are being targeted by scam artists and are at risk of being defrauded, and then prevent its users from cancelling their subscriptions and/or obtaining the full benefits for which they paid. These deceptive practices, which have given rise to a separate complaint by the Federal Trade Commission for violations of the Federal

1

Trade Commission Act and the Restore Online Shoppers' Confidence Act, *see FTC v. Match Group, Inc.*, Case No. 3:19-cv-02281, (N.D. Tex.), have also harmed innumerable private consumers including these Plaintiffs and the Class members they represent.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) because this is a class action where members of the proposed class of plaintiffs are citizens of a state different from Defendant and the aggregated amount in controversy exceeds $5,000,000, exclusive of interest and costs.

3.      This Court has personal jurisdiction over Defendant because it has a continuous, systematic, and substantial presence within the State of New York. Defendant regularly solicits and conducts business within the State of New York. In addition, Defendant has committed the below described acts in the State of New York, which have directly harmed residents of the State of New York.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this district. In addition, upon information and belief, thousands of class members reside in this district.

## PARTIES

5.      Plaintiff Neal D'Alessio ("Plaintiff #1") is a natural person who resides in Stanford, Connecticut, and who utilized Defendant's service while a resident of New York. Plaintiff #1 is a member of the putative class defined herein, and specifically of subclasses 1, 1A, 2, 2A, 4, 4A, and 6 proposed below.

6.      Plaintiff Kimberly Stevens ("Plaintiff #2") is a natural person who resides in Carrollton, Texas. Plaintiff #3 is a member of the putative class defined herein, and specifically of subclasses 1, 2, and 3 proposed below.

7.      Plaintiff Mark Beck ("Plaintiff #3") is a natural person who resides in Towson, Maryland. Plaintiff #3 is a member of the putative class defined herein, and specifically of subclasses 1, 2, 4, and 5 proposed below.

8.      Collectively, the plaintiffs are referred to herein as "Plaintiffs."

9.      Defendant Match Group, LLC is a Delaware limited liability company with its principal place of business at 8750 North Central Expressway, Suite 1400, Dallas, Texas 75231. Defendant transacts or has transacted business in this District and throughout the United States.

## FACTUAL BACKGROUND

10.      Defendant operates Match.com, one of the world's largest dating Web portals. The company's diverse portfolio of apps and products brands includes Tinder, PlentyOfFish, Meetic, OkCupid, and Hinge.

11.      Online dating services such as Defendant's purport to enable people to find and introduce themselves to potential connections over the Internet, usually with the goal of developing personal, romantic, or sexual relationships. Users of such services first create a profile containing personal information such as age, gender, and location along with a photograph. Other members of the same service can view each other's profiles to decide whether or not to initiate contact. If a member locates someone with whom they do want to contact (a "match"), the platforms offer methods for members to communicate such as direct messaging, emails, online chat, and message boards. Members can constrain their interactions to the online space, or they can arrange a date to meet in person.

3

12.     Unfortunately, criminals and other fraudsters often use online dating services such as Defendant's to locate potential victims and as tools to perpetrate their schemes. For example, perpetrators will send messages to other members claiming to be interested in a romantic match. If the innocent user responds, the scammer will attempt to establish a relationship with the victim with the goal of obtaining sensitive information or money from the victim.

A.      **Defendant's Use of Fraudulent Communications to Sell Subscriptions**

13.     Defendant's Match.com service allows users to create a "free" profile and to review other members' profiles without charge, as an enticement to join Defendant's database of users. However, Defendant primarily earns revenue from the Match.com service by upselling consumers into a paid subscription to the service which offers additional benefits. Subscriptions are sold in packages ranging from one to twelve months in length and automatically renewed unless the consumers take affirmative steps to cancel.

14.     Members who use the "free" services without paying for a subscription have limited abilities to interact with other members beyond passively reviewing profiles on the service. For example, "free" members are informed by Defendant when another member wishes to communicate with them. However, the "free" users are blocked from reading the communications or from viewing the profiles of members who wish to form a "match."

15.     Once a free subscription is established, users often begin receiving communications from Defendant indicating that another member wishes to make contact with them. However, due to the limitations of the "free" memberships, the user cannot read the communication from the other member or view their information in order to contact them directly. Defendant uses these limitations to encourage the user to upgrade to a paid subscription in order to communicate with their "match."

4

16.     Unbeknownst to the users, many of these communications are actually scammers attempting to make contact with new victims. Indeed, Plaintiffs are informed and believe that Defendant itself has identified as many as half of the instant message initiations and "favorites" sent in some months as fraudulent, i.e., sent for the purpose of perpetrating a scam.

17.     Defendant is well aware of the prevalence of scammers on its platform and that many of the communications sent to "free" users are illegitimate. Nevertheless, Defendant presents these fraudulent communications as legitimate attempts by other members to form a romantic match, and actively encourages these users to read these communications in order to sell more subscriptions.

18.     Based on Defendant's communications, users such as Plaintiffs reasonably believed that these fraudulent communications were in fact legitimate members looking for a romantic connection. Accordingly, the users paid for Defendant's subscriptions in order to view the other member's communication or their profiles, only to later determine that the communication was in fact illegitimate. Over the past several years, Plaintiffs are informed and believe and thereon allege that hundreds of thousands of consumers subscribed to Defendant's Match.com service after receiving a fraudulent communication.

19.     Indeed, after a user agrees to purchase a subscription in order to make contact with the "match" referenced by Defendant, the user often receives a notification saying that the profile of the member who sent the communication is "unavailable." The profile is "unavailable" because Defendant itself determined that the account was fraudulent and deleted it. Defendant neither informs the user that the member attempting to contact them was fraudulent nor permits the user to cancel their subscription.

5

20.     If a new subscriber complains about purchasing a subscription in order to review a profile that is actually "unavailable," Defendant misleadingly responds "Please be assured, Match.com does not send members misleading notifications, e-mails or winks professing romantic interest. We have too much respect for our members to ever compromise their trust. If you have received communications from members with profiles that are not immediately available, the member may have temporarily hidden their profile."

B.      **Defendant Knowingly Allowed Fraudsters to Operate on Defendant's Platform and Defraud Class Members**

21.     As noted above, Defendant is well aware of the prevalence of scam artists and criminals on its platform. Indeed, Defendant created an internal process to screen for users who appear to be illegitimate or attempting to perpetrate some form of fraud using Defendant's platform. Through this screening process, Defendant has the capability of blocking communications from suspected fraudsters, and has in fact used that technology to prevent suspected fraudulent communications from being sent to **paid** subscribers. However, until approximately mid-2018, Defendant knowingly allowed such fraudulent communications to be sent to "free" users – i.e., the users that Defendant was hoping to entice into upgrading to a paid subscription.

22.     As a result, for years Defendant knowingly passed along millions of fraudulent communications to their "free" users, well aware that a significant number of these communications were intended to entrap the users in a scam. Placing its own greed ahead of the interests of its customers, Defendant ignored the obvious harm of its actions because it knew that many of these fraudulent communications would entice the users into purchasing a subscription.

6

**C.** **Defendant Used Misleading "Guarantees" to Sell Subscriptions**

23.     Until mid-2019, Defendant misleadingly advertised on its Match.com website that users who purchased a six-month subscription received a "match GUARANTEE."

24.     As described in these advertisements, Defendant promised that any consumer who purchased a six-month paid subscription but did not "meet someone special" during the first six months would receive an additional six-month subscription for free. The advertisement did not disclose that this offer was subject to any additional terms or conditions.

25.     In fact, Defendant imposed terms and conditions on this "guarantee" which were nearly impossible for consumers to achieve, and which were only made known to consumers who followed a complicated process.

26.     Specifically, consumers would first need to click a "Learn more" button set out in Defendant's advertisement for the guarantee, which directed them to a rules page setting out several requirements that the consumer had to satisfy to receive the guarantee. This included requiring the consumers to sign up for a six-month subscription, creating a truthful public profile with a primary photo, and initiating or responding to communications with at least five unique Match.com members each month.

27.     In addition, this page stated the consumers must comply with a lengthy set of "Program Rules," which included such requirements as submitting a photo and having it approved by Defendant within the first **seven days** of purchasing the qualifying subscription.

28.     Although the "Program Rules" set forth these additional requirements in separate numbered paragraphs, which gave the appearance that all of the program's requirements were contained in these numbered paragraphs, numerous additional requirements were also misleadingly buried in unnumbered paragraphs that followed. One such requirement was that

consumers did not automatically receive the free six-month subscription even if they fulfilled all of the program requirements – they had to affirmatively "accept" the free six months, which could only be done during the final week of the initial six-month term.

29.     Also buried in these unnumbered paragraphs was a note that Defendant's website included a "progress page" tracking their compliance with the guarantee's rules. However, if consumers used this "progress page," the page misled consumers into believing that they were in compliance with the program's requirements by informing the consumers of their progress with respect to some requirements – such as creating a public profile with a photograph and starting a conversation with at least five Match.com members each month – but not identifying others, such as the requirement that consumers obtain Defendant's approval of their photograph within the first seven days.

30.     Given the misleading manner in which Defendant presented these various requirements, most consumers who purchased a six-month subscription in reliance on Defendant's "guarantee" were unaware of some or all of these various requirements, including that they must affirmatively accept the additional "free" subscription during the final week of their initial subscription.

31.     Moreover, even if a consumer did locate and review these various rules, followed them precisely and affirmatively accepted the free subscription during the narrow window permitted, Defendant would then present a prompt asking the consumer "[d]id you meet anyone during your 6-month guarantee program?" If the consumer honestly answered that they were introduced to "anyone" during their first six months – even if they did not meet "someone special" – they were disqualified from receiving the free six-month extension.

8

32.     As a result of the misleading way Defendant advertised the guarantee and applied its convoluted rules and requirements, most consumers who purchased a six-month subscription in reliance on Defendant's purported "guarantee" and then failed to meet "someone special" never received the promised free six-month extension. Plaintiff is informed and believes, and thereon alleges that of the nearly 2.5 million subscriptions sold by Defendant between 2013 and 2016 which were subject to the guarantee, only 32,438 free six-month subscriptions were given, while nearly 1 million of these consumers were charged for an additional six-month subscription.

D.     **Defendant Intentionally Uses a Misleading Cancellation Process Which Caused Class Members to Continue Being Charged Even After Believing They Cancelled Their Subscription**

33.     Members who purchase a subscription package from Defendant are required to provide their credit card or other payment information to pay for the initial subscription package. Once they have done so, Defendant uses a "negative option renewal" feature, meaning that Defendant automatically charges consumers for a new term at the end of each subscription period, unless the consumer affirmatively cancels their subscription.

34.     To try to dissuade consumers from doing so, Defendant knowingly adopted a convoluted process which either discourages consumers from cancelling their subscription or deceives them into believing they have cancelled, only to later discovery that their credit card or other payment source was charged for a renewed subscription because their cancellation was ineffective or incomplete.

35.     Defendant is aware and has been aware for many years that the process it uses is difficult and deceptive for its customers. Indeed, thousands of consumers have complained about Match.com's cancellation procedures and/or claimed that Defendant billed them after they believed they effectively canceled their Match.com subscriptions.

9

E.     **Defendant Withholds Paid-For Services from Class Members Who Disputed Defendant's Charges**

36.     Because of Defendant's deceptive advertising, billing, and cancellation practices, consumers often raise billing disputes with Defendant. In numerous instances, consumers dispute Defendant's charges through their financial institutions.

37.     When consumers dispute these charges, Defendant contests the disputes. Until mid-2019, when Defendant prevailed in a billing dispute, Defendant often failed to provide consumers access to their Match.com accounts or to the subscription services that the consumers paid for. Instead, Defendant terminated the consumers' accounts and deleted their profiles.

38.     In fact, Match.com's Terms of Use warned that if Defendant "successfully disputes the reversal [of charges], and the reversed funds are returned, you are not entitled to a refund or to have your account or subscription reinstated." Defendant placed this disclosure near the end of its lengthy Terms of Use document and did not set it off or otherwise made it conspicuous to consumers. Defendant has since modified these Terms of Use to indicate that "If you initiate a chargeback or otherwise reverse a payment made with your Payment Method, Match may terminate your account immediately in its sole discretion."

39.     Many of the consumers who disputed a charge and lost the dispute often had remaining time in their subscriptions, yet were prevented accessing the services they paid for due to Match's termination of their account.

## ALLEGATIONS SPECIFIC TO PLAINTIFFS

A.      **Plaintiff #1**

40.      In 2017, Plaintiff #1 created a free online profile on Match.com. Almost immediately thereafter, Plaintiff began to receive emails from Match.com stating that other Match.com users were interested in him.

41.      In reliance on Defendant's email, Plaintiff #1 agreed to upgrade his free membership to a paid subscription in order to make contact with these individuals.

42.      After Plaintiff #1 upgraded to a paid subscription, he attempted to view the profile of the member that purportedly wanted to communicate with him. However, the profile was listed as "unavailable." This pattern repeated multiple times over the next several weeks – Plaintiff #1 would receive a communication indicating that another member was interested in speaking with him, only to later discover that the member's account was deleted by Defendant. Ultimately, nearly all of the communications that Plaintiff #1 received were from illegitimate members using fake profiles.

43.      When Plaintiff #1 attempted to contact Defendant's customer service department to complain, he received an email in which Defendant misleadingly stated: "Please be assured, Match.com does not send members misleading notifications, e-mails or winks professing romantic interest. We have too much respect for our members to ever compromise their trust. If you have received communications from members with profiles that are not immediately available, the member may have temporarily hidden their profile."

44.      But for the communications Plaintiff #1 received indicating that a legitimate user wished to make contact with him, he would never have agreed to upgrade his membership to a paid subscription.

11

45.     In addition, Plaintiff #1 discovered that many users were in fact scam artists attempting to solicit money from Plaintiff #1, rather than a legitimate members.

46.     But for Defendant's representation that this was a legitimate user seeking to form a "match," Plaintiff #1 would not have paid for a subscription to Defendant's service or initiated a communication with this individual. Indeed, had Defendant simply used its screening process to block this individual's initial fraudulent communication, as Defendant was capable of doing and in fact did for its paid subscribers, Plaintiff #1 would not have been injured as herein described.

47.     Later, and before his paid subscription period ended, Plaintiff #1 decided to cancel his subscription. Plaintiff #1 attempted to do so via the cancellation instructions on the Match.com website. However, because of the deliberately confusing manner in which those instructions were created, Plaintiff #1 was misled into believing that he had cancelled his subscription, when in fact he did not. As a result, and because of Defendant's "negative option renewal" policy whereby subscriptions are automatically renewed unless a subscriber affirmatively completes Defendant's cancellation process, when Plaintiff #1's initial subscription period ended he was charged for another subscription period.

48.     Finally, When Plaintiff #1 cancelled his subscription, Defendant did not return all personal information to him upon termination in accordance with New York state law. Instead, Defendant advised Plaintiff #1 members that Defendant "cannot promise that all data will be deleted within a specific timeframe due to technical constraints."

B.     **Plaintiff #2**

49.     In 2017, Plaintiff #2 created a free online profile on Match.com. Almost immediately thereafter, Plaintiff began to receive emails from Match.com stating that other Match.com users were interested in her.

50.     In reliance on these communications, Plaintiff #2 agreed to upgrade her free membership to a paid subscription in order to make contact with these individuals.

51.     After Plaintiff #2 upgraded to a paid subscription, she attempted to view the profile of the member that purportedly wanted to communicate with her. However, the profile was listed as "unavailable." This pattern repeated multiple times over the next several weeks – Plaintiff #2 would receive a communication indicating that another member was interested in speaking with her, only to later discover that the member's account was deleted by Defendant. Ultimately, nearly all of the communications that Plaintiff #1 received were from illegitimate members using fake profiles.

52.     But for the communications Plaintiff #2 received indicating that a legitimate user wished to make contact with her, she would never have agreed to upgrade her membership to a paid subscription.

53.     In addition, Plaintiff #2 reviewed one of the communications she received while a "free" user, and initiated communication with this user.

54.     Ultimately, however, Plaintiff #2 discovered that this user was in fact a scam artist attempting to solicit money from Plaintiff #2, rather than a legitimate member.

55.     But for Defendant's representation that this was a legitimate user seeking to form a "match," Plaintiff #2 would not have paid for a subscription to Defendant's service or initiated a relationship with this individual. Indeed, had Defendant simply used its screening process to

block this individual's initial fraudulent communication, as Defendant was capable of doing and in fact did for its paid subscribers, Plaintiff #2 would not have been injured as herein described.

56.    Plaintiff #2 also agreed to purchase a six-month subscription to use the Match.com service. At the time Plaintiff did so, it was in response to an advertisement on the Match.com website that promised a "match GUARANTEE," whereby Defendant promised simply that any consumer who purchased a six-month paid subscription but did not "meet someone special" during the first six months would receive an "extra 6 months FREE."

57.    In reliance on this "guarantee," Plaintiff #2 purchased the six-month subscription.

58.    Thereafter, Plaintiff #2 did not make a romantic connection with any other member on the Match.com platform within the first six months of her subscription. Nevertheless, when Plaintiff #3's initial six-month subscription ended, Defendant, rather than immediately grant her an additional six-month enrollment with no additional cost, offered Plaintiff #2 a "discount" an additional three-month subscription.

59.    When Plaintiff #2 demanded that she receive the promised additional six-month subscription for free, Defendant refused to honor its original promise, citing the additional requirements for the guarantee that were not specifically delineated or referred to in the original advertisement.

60.    Contrary to Defendant's simple representation of a "love guarantee," Defendant advised Plaintiff #2 that, during the six-month "guarantee" period, any communication whatsoever from another user, regardless of the outcome of the communication, satisfied Defendant's "love guarantee."

C.    **Plaintiff #3**

61.    In 2017, Plaintiff #3 created a free online profile on Match.com. Almost immediately thereafter, Plaintiff began to receive emails from Match.com stating that other Match.com users were interested in him.

62.    In reliance on Defendant's email, Plaintiff #3 agreed to upgrade his free membership to a paid subscription in order to make contact with these individuals.

63.    After Plaintiff #3 upgraded to a paid subscription, he attempted to view the profile of the member that purportedly wanted to communicate with him. However, the profile was listed as "unavailable." This pattern repeated multiple times over the next several weeks – Plaintiff #3 would receive a communication indicating that another member was interested in speaking with him, only to later discover that the member's account was deleted by Defendant. Ultimately, nearly all of the communications that Plaintiff #3 received were from illegitimate members using fake profiles.

64.    But for the communications Plaintiff #3 received indicating that a legitimate user wished to make contact with him, he would never have agreed to upgrade his membership to a paid subscription.

65.    In addition, Plaintiff #3 discovered that many users were in fact scam artists attempting to solicit money from Plaintiff #3, rather than legitimate members.

66.    But for Defendant's representation that this was a legitimate user seeking to form a "match," Plaintiff #3 would not have paid for a subscription to Defendant's service or initiated a communication with this individual. Indeed, had Defendant simply used its screening process to block this individual's initial fraudulent communication, as Defendant was capable of doing

and in fact did for its paid subscribers, Plaintiff #3 would not have been injured as herein described.

67.     Later, and before his paid subscription period ended, Plaintiff #3 decided to cancel his subscription. Plaintiff #3 attempted to do so via the cancellation instructions on the Match.com website. However, because of the deliberately confusing manner in which those instructions were created, Plaintiff #3 was misled into believing that he had cancelled his subscription, when in fact he did not. As a result, and because of Defendant's "negative option renewal" policy whereby subscriptions are automatically renewed unless a subscriber affirmatively completes Defendant's cancellation process, when Plaintiff #3's initial subscription period ended he was charged $59.97 for several additional subscription periods.

68.     Moreover, because of Defendant's deliberately confusing cancellation process and subsequent charges to Plaintiff #3, Plaintiff #3 initiated a dispute with his credit card company in an attempt to recover monies improperly taken by Defendant.

69.     Ultimately, Plaintiff #3's financial institution sided with Defendant and rejected Plaintiff #3's dispute to the charges. At this point, Defendant deleted Plaintiff #3's account and blocked Plaintiff #3 from further use of the Match.com services. At the time Defendant did so, Plaintiff #3 still had time left on his paid-for subscription, but Defendant provided no refund for this remaining time. Accordingly, as the result of Defendant's actions, Plaintiff #3 did not receive the full benefits for which he paid.

## CLASS ACTION ALLEGATIONS

70.     This action satisfies the prerequisites for maintenance as a class action provided in Fed. R. Civ. P. 23, as set forth herein.

71.     **Class Definition**. Plaintiffs bring this action individually and on behalf of the following class of similarly situated persons (the "Class"), of which Plaintiffs are members: All natural persons domiciled in the United States or its territories who, within the applicable statutes of limitation, paid for a subscription to the Match.com dating site and who further fall into one of the following ten subclasses:

  a.  **Subclass #1:** All natural persons domiciled in the United States or its territories who, within the applicable statutes of limitation, paid for a subscription to the Match.com dating site after receiving a notification from Defendant that a message was sent from a user who was not a legitimate user of the site.

  b.  **Subclass #1A:** All natural persons domiciled in the State of New York who, within the applicable statutes of limitation, paid for a subscription to the Match.com dating site after receiving a notification from Defendant that a message was sent from a user who was not a legitimate user of the site.

  c.  **Subclass #2:** All natural persons domiciled in the United States or its territories who, within the applicable statutes of limitation, received a communication Defendant had already flagged as potentially fraudulent at the time the communication was passed to the subclass member.

  d.  **Subclass #2A:** All natural persons domiciled in the State of New York who, within the applicable statutes of limitation, received a communication Defendant had already flagged as potentially fraudulent at the time the communication was passed to the subclass member.

17

e. **Subclass #3:** All natural persons domiciled in the United States or its territories who, within the applicable statutes of limitation, paid for a six-month subscription to the Match.com dating site, did not meet someone special during the six-month period, and did not receive a further six-month subscription for free.

f. **Subclass #3A:** All natural persons domiciled in the State of New York who, within the applicable statutes of limitation, paid for a six-month subscription to the Match.com dating site, did not meet someone special during the six-month period, and did not receive a further six-month subscription for free.

g. **Subclass #4:** All natural persons domiciled in the United States or its territories who, within the applicable statutes of limitation, paid for a subscription to the Match.com dating site, attempted to cancel their subscription, and were nevertheless charged for an additional subscription period.

h. **Subclass #4A:** All natural persons domiciled in the State of New York who, within the applicable statutes of limitation, paid for a subscription to the Match.com dating site, attempted to cancel their subscription, and were nevertheless charged for an additional subscription period.

i. **Subclass #5:** All natural persons domiciled in the United States or its territories who, within the applicable statutes of limitation, paid for a subscription to the Match.com dating site, unsuccessfully disputed a charge made by Defendant with their financial institution, and then had their account

with Defendant terminated before their paid-for subscription period ended and without any refund from Defendant.

j.  **Subclass #5A:** All natural persons domiciled in the State of New York who, within the applicable statutes of limitation, paid for a subscription to the Match.com dating site, unsuccessfully disputed a charge made by Defendant with their financial institution, and then had their account with Defendant terminated before their paid-for subscription period ended and without any refund from Defendant.

k.  **Subclass #6:** All natural persons domiciled in the United States or its territories who, within the applicable statutes of limitation, paid for a subscription to the Match.com dating site, cancelled their subscription, and contrary to New York State law, Defendant did not return all information to the Subclass #6 members upon termination of their subscriptions or deletion of their accounts. Instead, Defendant advised Subclass #6 members that Defendant "cannot promise that all data will be deleted within a specific timeframe due to technical constraints."

72.  Excluded from the Class and each Subclass are Defendant and any of its respective officers, directors or employees, the presiding judge, Class counsel and members of their immediate families, and persons or entities who timely and properly exclude themselves from the Class.

73.  **Numerosity**. The members of the Class and of each Subclass are so numerous and geographically dispersed throughout the United States such that joinder of all members is impracticable. Plaintiffs are informed and believe and thereon allege that there are thousands of

persons in the Class and in each Subclass. The exact number and identity of Class members is unknown to Plaintiffs at this time and can only be ascertained from information and records in the possession, custody or control of Defendant.

74.    **Commonality**. There are questions of law or fact common to each Subclass including, but not limited to, the following:

a.    Whether Plaintiffs #1, #2, and #3 and each member of Subclasses 1 and 1A received advertisements from Defendant encouraging them to purchase subscriptions in order to review messages from users Defendant knew or should have known were not legitimate.

b.    Whether Plaintiffs #1, #2, and #3 and each member of Subclasses 2 and 2A received advertisements from Defendant encouraging them to review messages that Defendant already flagged as potentially fraudulent and did not send to its paid subscribers.

c.    Whether Plaintiff #2 and each member of Subclasses 3 and 3A purchased six-month subscriptions after viewing an advertisement which promised that Defendant would "guarantee" that the purchasing users would meet "someone special" or they would receive a free six-month extension to their subscriptions.

d.    Whether Plaintiff #3 and each member of Subclasses 4 and 4A were charged by Defendant for a renewed subscription after the users attempted to cancel their memberships.

e.    Whether Plaintiff #3 and each member of Subclasses 5 and 5A initiated a dispute with their financial institution over charges made by Defendant, and

20

subsequently had their accounts terminated before the end of their paid-for subscription period.

    f.   Whether Plaintiff #1 and the members of Subclass 6 failed to receive their personal information back upon termination of their subscriptions in accordance with New York state law.

75.    **Typicality**. The claims of Plaintiffs are typical of the claims of the Class and each Subclass to which the Plaintiffs belong as alleged herein. The claims of Plaintiffs and the other members of each Subclass to which Plaintiffs respectively belong arise out of Defendant's uniform conduct and statements.

76.    **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel who are competent and experienced in the prosecution of complex and class action litigation. The interests of Plaintiffs are aligned with, and not antagonistic to, those of the Class and of each Subclass.

77.    **Superiority**. A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be nearly impossible for members of the Class to individually redress the wrongs done to them in separate actions. Individualized rulings and judgments could result in inconsistent relief for similarly-situated individuals.

**COUNT I - FRAUD**
**(On behalf of Plaintiffs #1, #2, and #3 and Subclasses 1 and 1A)**

78.     Plaintiffs incorporate by reference each allegation of Paragraph 1 through 77 as if fully set forth herein.

79.     Under New York law, to state a claim for fraud in the inducement, a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff.

80.     As set forth herein, Defendant made a material misrepresentation or omission of material fact when it implied that the users purportedly attempting to contact these Class members were legitimate users. Defendant did so in order to induce these members to purchase a paid subscription to Defendant's services.

81.     Alternatively, Defendant concealed, suppressed or omitted the material fact that such messages could be and frequently were from inactive users who were not available for the dating referral service.

82.     As a direct and proximate result of the foregoing, Plaintiffs #1, #2, and #3 and the members of Subclasses 1 and 1A purchased subscriptions from Defendant that they would not have purchased had the true facts been known to them.

83.     Alternatively, Plaintiffs #1, #2, and #3 and the members of Subclasses 1 and 1A lacked the information necessary to make an informed choice regarding their decision to purchase such subscriptions.

84.     As a result, Plaintiffs #1, #2, and #3 and the members of Subclasses 1 and 1A have been damaged in an amount to be proven at trial.

22

**COUNT II - FRAUD**
**(On behalf of Plaintiffs #1, #2, and #3 and Subclasses 2 and 2A)**

85.     Plaintiffs incorporate by reference each allegation of Paragraph 1 through 77 as if fully set forth herein.

86.     As set forth herein, Defendant made a material misrepresentation or omission of material fact when it implied that the users purportedly attempting to contact these Class members were legitimate users, even though Defendant had already flagged these communications as potentially fraudulent. Defendant did so in order to induce these members to purchase a paid subscription to Defendant's services.

87.     Alternatively, Defendant concealed, suppressed or omitted the material fact that such messages could be and likely were from illegitimate users who were attempting to engage in some form of fraudulent behavior.

88.     As a direct and proximate result of the foregoing, Plaintiffs #1, #2, and #3 and the members of Subclasses 2 and 2A purchased subscriptions from Defendant that they would not have purchased had the true facts been known to them.

89.     Alternatively, Plaintiffs #1, #2, and #3 and the members of Subclasses 2 and 2A lacked the information necessary to make an informed choice regarding their decision to purchase such subscriptions.

90.     As a result, Plaintiffs #1, #2, and #3 and the members of Subclasses 2 and 2A have been damaged in an amount to be proven at trial.

## COUNT III - FRAUD
### (On behalf of Plaintiff #2 and Subclasses 3 and 3A)

91.     Plaintiffs incorporate by reference each allegation of Paragraph 1 through 77 as if fully set forth herein.

92.     As set forth herein, Defendant made a material misrepresentation or omission of material fact when it promised these Class members that, if they purchased a six-month subscription and did not "meet someone special" within that six-month period, they would receive an additional six-month subscription for free. Defendant did so in order to induce these members to purchase the six-month subscription to Defendant's services.

93.     Alternatively, Defendant concealed, suppressed or omitted the material fact that any such "guarantee" was subject to convoluted rules not readily apparent to the members based on the manner in which Defendant provided access to said rules.

94.     As a direct and proximate result of the foregoing, Plaintiff #2 and the members of Subclasses 3 and 3A purchased subscriptions from Defendant that they would not have purchased had the true facts been known to them.

95.     Alternatively, Plaintiff #2 and the members of Subclasses 3 and 3A lacked the information necessary to make an informed choice regarding their decision to purchase such subscriptions.

96.     As a result, Plaintiff #2 and the members of Subclasses 3 and 3A have been damaged in an amount to be proven at trial.

## COUNT IV – BREACH OF CONTRACT
**(On behalf of Plaintiff #2 and Subclasses 3 and 3A)**

97.     Plaintiffs incorporate by reference each allegation of Paragraph 1 through 77 as if fully set forth herein.

98.     As set forth herein, these Class members entered into an agreement with Defendant whereby the members agreed to purchase a six-month subscription to Defendant's services in exchange for, among other things, a "guarantee" that if the members did not meet "someone special" during the initial six-month period, Defendant would provide an additional six-month subscription for free.

99.     Plaintiff #2 and the members of Subclasses 3 and 3A performed all of the conditions and covenants owed to Defendants under the terms of their agreement, except for those obligations that may have been excused by the conduct of Defendant. Specifically, Plaintiff #2 and the members of Subclasses 3 and 3A purchased and paid for six-month subscriptions to Defendants' services and thereafter did not meet "someone special" during the initial six-month subscription period.

100.     Defendant breached the parties' agreement in performing the acts described herein, including without limitation, by failing to honor its guarantee and failing to provide a free six-month subscription to each of these Class members upon the conclusion of their initial six-month subscription period.

101.     As a result, Plaintiff #2 and the members of Subclasses 3 and 3A have been damaged in an amount to be proven at trial.

**COUNT V – BREACH OF IMPLIED COVENANT**
**OF GOOD FAITH AND FAIR DEALING**
**(On behalf of Plaintiff #2 and Subclasses 3 and 3A)**

102.    Plaintiffs incorporate by reference each allegation of Paragraph 1 through 77 as if fully set forth herein.

103.    The implied covenant of good faith and fair dealing is breached when a party acts in a manner that would deprive the other party of the right to receive the benefits of their agreement. The implied covenant includes any promises which a reasonable promisee would be justified in understanding were included.

104.    As set forth herein, these Class members entered into an agreement with Defendant whereby the members agreed to purchase a six-month subscription to Defendant's services in exchange for, among other things, a "guarantee" that if the members did not meet "someone special" during the initial six-month period, Defendant would provide an additional six-month subscription for free.

105.    Plaintiff #2 and the members of Subclasses 3 and 3A performed all of the conditions and covenants owed to Defendants under the terms of their agreement, except for those obligations that may have been excused by the conduct of Defendant. Specifically, Plaintiff #3 and the members of Subclasses 3 and 3A purchased and paid for six-month subscriptions to Defendants' services and thereafter did not meet "someone special" during the initial six-month subscription period.

106.    Defendant thereafter failed to honor its guarantee and failed to provide a free six-month subscription to each of these Class members upon the conclusion of their initial six-month subscription period. In insisting on compliance with convoluted and concealed rules that were not made apparent to the members, and/or providing indications that a member was following

26

such rules through "progress" pages that were incomplete, Defendant deprived these members of the benefit of their agreement.

107.     As a result, Plaintiff #2 and the members of Subclasses 3 and 3A have been damaged in an amount to be proven at trial.

### COUNT VI – BREACH OF CONTRACT
**(On behalf of Plaintiff #1 and #3 and Subclasses 4 and 4A)**

108.     Plaintiffs incorporate by reference each allegation of Paragraph 1 through 77 as if fully set forth herein.

109.     As set forth herein, these Class members entered into an agreement with Defendant whereby the members agreed to purchase a subscription to Defendant's services for a limited time, with the option for these members to cancel the subscriptions to avoid further fees.

110.     Plaintiffs #1 and #3 and the members of Subclasses 4 and 4A performed all of the conditions and covenants owed to Defendants under the terms of their agreement, except for those obligations that may have been excused by the conduct of Defendant. Specifically, Plaintiffs #1 and #3 and the members of Subclasses 4 and 4A purchased and paid for subscriptions to Defendants' services and thereafter made good faith efforts to cancel their subscriptions but were either prevented from doing so due to the manner in which Defendant intentionally obfuscated the cancellation process or were misled into believing that they had cancelled when they had not.

111.     Defendant breached the parties' agreement in performing the acts described herein, including without limitation, by preventing these members from cancelling their subscriptions to avoid further fees, and thereafter charging them for additional subscription periods.

112.    As a result, Plaintiffs #1 and #3 and the members of Subclasses 4 and 4A have been damaged in an amount to be proven at trial.

**COUNT VII – BREACH OF IMPLIED COVENANT**
**OF GOOD FAITH AND FAIR DEALING**
**(On behalf of Plaintiffs #1 and #3 and Subclasses 4 and 4A)**

113.    Plaintiffs incorporate by reference each allegation of Paragraph 1 through 77 as if fully set forth herein.

114.    As set forth herein, these Class members entered into an agreement with Defendant whereby the members agreed to purchase a subscription to Defendant's services for a limited time, with the option for these members to cancel the subscriptions to avoid further fees.

115.    Plaintiffs #1 and #3 and the members of Subclasses 4 and 4A performed all of the conditions and covenants owed to Defendants under the terms of their agreement, except for those obligations that may have been excused by the conduct of Defendant. Specifically, Plaintiffs #1 and #3 and the members of Subclasses 4 and 4A purchased and paid for subscriptions to Defendants' services and thereafter made good faith efforts to cancel their subscriptions but were either prevented from doing so due to the manner in which Defendant intentionally obfuscated the cancellation process or were misled into believing that they had cancelled when they had not. In taking the actions herein alleged, Defendant deprived these members of the benefit of their agreement.

116.    As a result, Plaintiffs #1 and #3 and the members of Subclasses 4 and 4A have been damaged in an amount to be proven at trial.

## COUNT VIII – BREACH OF CONTRACT
**(On behalf of Plaintiff #3 and Subclasses 5 and 5A)**

117.    Plaintiffs incorporate by reference each allegation of Paragraph 1 through 77 as if fully set forth herein.

118.    As set forth herein, these Class members entered into an agreement with Defendant whereby the members agreed to purchase subscriptions to Defendant's services in exchange for full use of such services for the period paid for.

119.    Plaintiff #3 and the members of Subclasses 5 and 5A performed all of the conditions and covenants owed to Defendants under the terms of their agreement, except for those obligations that may have been excused by the conduct of Defendant.

120.    Defendant breached the parties' agreement in performing the acts described herein, including without limitation, by terminating these users' accounts in retaliation for their initiation of chargebacks with their financial institutions, and preventing them from using Defendant's services for the remainder of their subscription periods even if the chargebacks were declined and Defendant kept the subscription fees for these periods.

121.    As a result, Plaintiff #3 and the members of Subclasses 5 and 5A have been damaged in an amount to be proven at trial.

## COUNT IX – BREACH OF IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING
**(On behalf of Plaintiff #3 and Subclasses 5 and 5A)**

122.    Plaintiffs incorporate by reference each allegation of Paragraph 1 through 77 as if fully set forth herein.

123.    As set forth herein, these Class members entered into an agreement with Defendant whereby the members agreed to purchase subscriptions to Defendant's services in exchange for full use of such services for the period paid for.

124.    Plaintiff #3 and the members of Subclasses 5 and 5A performed all of the conditions and covenants owed to Defendants under the terms of their agreement, except for those obligations that may have been excused by the conduct of Defendant.

125.    Defendant breached the parties' agreement in performing the acts described herein, including without limitation, by terminating these users' accounts in retaliation for their initiation of chargebacks with their financial institutions, and preventing them from using Defendant's services for the remainder of their subscription periods even if the chargebacks were declined and Defendant kept the subscription fees for these periods. In taking the actions herein alleged, Defendant deprived these members of the benefit of their agreement.

126.    As a result, Plaintiff #3 and the members of Subclasses 5 and 5A have been damaged in an amount to be proven at trial.

## COUNT X – VIOLATION OF NEW YORK GEN. BUS. LAW §349
### (On behalf of Plaintiff #1 and Subclasses 1A, 2A, 3A, 4A and 5A)

127.    Plaintiffs incorporate by reference each allegation of Paragraph 1 through 77 as if fully set forth herein.

128.    Defendant's deceptive actions as alleged herein, including but not limited to Defendant's attempts to induce users to purchase subscriptions based on fraudulent communications from illegitimate users; Defendant's permitting known and suspected fraudulent communications to be sent to free users in order to entice those users into purchasing paid subscriptions; Defendant's false or misleading "guarantee"; Defendant's deliberate creation of a

confusing cancellation process designed to prevent users from completing their cancellation or to be misled into believing they cancelled when they did not; and Defendant's practice of terminating users' accounts without refund in retaliation for initiating chargebacks with financial institutions; has been, and continues to be, materially misleading and deceptive to these members of these subclasses in material respects.

129.    Defendant's actions as alleged herein were and are directed at consumers such as Plaintiff #1 and these members, and has had, and continues to have, a broad negative impact on the general public, including to these members of these subclasses.

130.    Defendant's actions as alleged herein were and are likely to mislead reasonable consumers such as Plaintiff #1 and the members of subclasses 1A, 2A, 3A, 4A and 5A.

131.    Defendant's actions -- in collecting subscription fees based on inactive and fraudulent profiles, instituting complex and opaque cancellation, and penalizing subscribers who dispute Defendant's charges -- have materially misled reasonable consumers including Plaintiff #1 and the members of subclasses 1A, 2A, 3A, 4A and 5A.

132.    Defendant's aforementioned misleading and deceptive practices violate the consumer protection provisions of § 349 of the New York General Business Law.

133.    Plaintiff #1 and members of subclasses 1A, 2A, 3A, 4A and 5A have been, and continue to be, injured by reason of their being deceived and misled by Defendant's actions.

134.    At least some of Defendant's deceptive actions as alleged herein are ongoing and will continue unless enjoined by the Court. By reason of the foregoing, Plaintiffs are entitled to a restraining order, preliminary injunction and permanent injunction, enjoining Defendant from continuing their deceptive actions.

135.    By reason of the foregoing, Plaintiffs are entitled to recover their actual damages and attorneys' fees.

### COUNT XI – VIOLATION OF NEW YORK GEN. BUS. LAW §394-c
**(On behalf of Plaintiff #1 and Subclass 6)**

136.    Plaintiffs incorporate by reference each allegation of Paragraph 1 through 77 as if fully set forth herein.

137.    In addition to being deceptive and fraudulent as hereinabove alleged, Defendant's policies and practices also violate N.Y. G.B.L § 394-c and deprive consumers of their rights under this law.

138.    N.Y. G.B.L § 394-c applies to "social referral services." N.Y. G.B.L. § 394-c(1). The law defines a "social referral service" to "include any service for a fee providing matching of members of the opposite sex, by use of computer or any other means, for the purpose of dating and general social contact." N.Y. G.B.L. § 394-c(1)(a). Because Defendant's service is a fee-based service, by computer, with the purpose of dating and general social contact, it is a "social referral service" under the statute. Nevertheless, Defendant's service fails to comply with this law.

139.    Specifically, N.Y. G.B.L § 394-c(6) states that "[e]very contract for social referral service shall provide that at the expiration of the contract or at the expiration of services rendered by the seller, for any reason, all information and material of a personal or private nature acquired from a purchaser directly or indirectly including but not limited to answers to tests and questionnaires, photographs or background information shall be promptly returned by the seller to the purchaser by certified mail." By use of the word "shall," this provision is mandatory.

140.    Plaintiffs are informed and believed and thereon allege that Defendant does not, however, return all such information to its subscribers upon termination of their subscriptions or deletion of their accounts. Rather, Defendant retains such information in accordance with its privacy policy, which provides in part that Defendant retains such information "as long as we need it for legitimate business purposes." Defendant further notes that "we cannot promise that all data will be deleted within a specific timeframe due to technical constraints."

141.    By maintaining such information from users who are no longer subscribed to Defendant's service, Defendant can artificially "pad" its subscriber base to make it appear that Defendant has more subscribers – and thus more potential matches – than it actually does, thereby enticing more people to subscribe to its service.

142.    Plaintiff #1 and members of subclass 6 have been, and continue to be, injured by reason of these violations of New York law.

143.    Pursuant to N.Y. G.B.L § section 394-c, Plaintiff #1 on his own behalf and on behalf of the members of Subclass #6 seeks the greater of actual or statutory damages, costs and expenses, and pre- and post-judgment interest.

144.    Defendant's actions as alleged herein are ongoing and will continue unless enjoined by the Court. By reason of the foregoing, and pursuant to N.Y. G.B.L § 394-c(9)(b), Plaintiffs are entitled to a restraining order, preliminary injunction and permanent injunction, enjoining Defendant from continuing their actions.

## COUNT XII – Unjust Enrichment
### (On behalf of All Plaintiffs and All Subclasses)

145.    Plaintiffs incorporate by reference each allegation of Paragraph 1 through 77 as if fully set forth herein.

33

146.     On information and belief, at all times material to this action the average annual cost of a subscription to Match.com was over $200.

147.     The Plaintiffs and class members of Subclasses 1 through 6 and 1A through 5A paid valuable consideration for their subscriptions to Match.com.

148.     In exchange for their subscription fees, the Plaintiffs and class members of Subclasses 1 through 6 and 1A through 5A encountered inactive dating profiles, fraudulent dating profiles, an inoperative guarantee of finding love, difficulty cancelling their subscriptions, and a punitive response from Match when they initiated a chargeback against Match due to a billing dispute.

149.     By collecting subscription fees from Plaintiff class members, Defendant was enriched.

150.     Defendant's enrichment occurred at the expense of the class members.

151.     It is against equity and good conscience to permit the Defendant to retain Plaintiff class members' subscription fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, requests relief and judgment against Defendant as follows:

a.  That the Court enter an order certifying the Class, appointing Plaintiffs as representatives of the Class and of each Subclass, appointing Plaintiffs' counsel as class counsel, and directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class and each Subclass;

b.  For a judgment against Defendant for the causes of action alleged against it;

34

c.   For compensatory damages in an amount to be proven at trial, including treble damages as allowed by the Court;

d.   For punitive damages based upon Defendant's full knowledge that it was offering Plaintiffs and the class members non-responsive and fraudulent dating profiles to the detriment of Plaintiffs, class members, and the general public;

e.   For appropriate injunctive relief, enjoining Defendant from continuing to engage in the conduct alleged herein;

f.   For equitable relief including, inter alia, a finding that the contracts they entered into are void and unenforceable and disgorgement of Defendant's ill-gotten gains;

g.   For pre-judgment and post-judgment interest at the maximum rate permitted by law;

h.   For Plaintiffs' attorney's fees;

i.   For Plaintiffs' costs incurred; and

j.   For such other relief in law or equity as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated: July 6, 2021                         Respectfully submitted,

                                            /s/ Richard A. Klass_____
                                            Richard A. Klass, Esq.
                                            Attorney for Plaintiffs
                                            16 Court Street, 28th Floor
                                            Brooklyn, NY 11241
                                            718-643-6063
                                            RichKlass@courtstreetlaw.com

                                            Marcus W. Corwin, Esq. (*pro hac vice* to be filed)
                                            Stephen L. Conteaguero, Esq. (*pro hac vice* to be filed)
                                            CORWIN LAW
                                            MARCUS W. CORWIN, P.A.
                                            6001 Broken Sound Parkway NW
                                            Suite 404
                                            Boca Raton, FL 33487
                                            561.482.3636 – Telephone
                                            561.482.5414 – Facsimile
                                            mcorwin@corwinlawfirm.com
                                            sconteaguero@corwinlawfirm.com

                                            *Attorneys for Plaintiffs and the Proposed Class*